Scileppi, J.
On June 7, 1962 appellant Johnson, Drake & Piper, Inc. (hereinafter JDP) entered into a prime contract with the State of New York for the construction of a portion of the Niagara Parkway in Niagara Falls, New York. Under purchase orders issued by JDP, defendant Franjoine Trucking, Inc. (hereinafter Franjoine) agreed to supply gravel and stone to JDP at the jobsite for purposes of constructing the roadbed and also as backfill in other portions of the project. In making deliveries under these purchase orders, Franjoine used highlifts to load the trucks in the gravel pits and dump trucks to transport the gravel to the jobsite. Franjoine, however, only owned four dump trucks and one highlift and, therefore, it became necessary to lease from plaintiff-respondent, A & J Buyers, Inc., and the cross-claiming defendants, a number of trucks and highlifts with drivers and operators to fulfill its obligations under the purchase orders.
Although JDP paid Franjoine a substantial amount of that due and owing for the materials delivered to the jobsite, Franjoine allegedly failed to pay the respondent and cross-claiming defendants the amounts due them for the leasing of their trucks and highlifts. As a result, the respondent (claiming) and the defendants (cross-claiming) brought this action against JDP *268 and its bonding company on the payment bond for liens aggregating approximately $83,000.
Section 5 of the Lien Law provides: “ A person performing labor for or furnishing materials to a contractor, Ms subcontractor or legal representative, for the construction or demolition of a public improvement pursuant to a contract by such contractor with the state or a public corporation, shall have a lien for the principal and interest of the value or agreed price of such labor or materials upon the moneys of the state or of such corporation applicable to the construction or demolition of such improvement ” (emphasis added).
Clearly having furnished materials to JDP, the general contractor for the State, Franjoine would have a valid lien under this section on all moneys due and owing from JDP. That, however, is not the question before us. The respondent and cross-claiming defendants, not having dealt directly with JDP, cannot establish lienor status by furnishing labor or materials to a contractor pursuant to a contract with the State. They dealt only with Franjoine and, therefore, to establish their status as lienors under this section, it must be shown that Franjoine was a subcontractor of JDP; for if it be determined that Franjoine’s performance was only that of a materialman, then respondent and cross-claiming defendants would not qualify as lienors since section 5 does not recognize a materialman’s lien against another materialman.
The appellants moved for summary judgment against the respondent and cross-claiming defendants on the ground that they were mere materialmen of a materialman and thus did not have valid liens. Special Term, however, granted partial summary judgment against appellants finding that Franjoine was in fact a subcontractor of JDP. On appeal, the Appellate Division modified by reversing that portion of the order which granted partial summary judgment. The court stated that “ [ujnder the facts in this case a trial is required to determine whether Franjoine Trucking, Inc., was a subcontractor or merely a materialman on the construction project ” (25 A D 2d 716).
The essential facts adduced at trial bearing on the issue of Franjoine’s status are substantially the following:
*269 In addition to the construction of the road, JDP was required by the job specifications to build certain bridges, and backfill a sewer line. Pursuant to the State’s standard specifications, JDP was required to use various grades of gravel depending upon the nature of the work being performed at a particular jobsite. Sixty percent of the gravel- sold by Franjoine, primarily used by JDP in the construction of the bridge abutments and backfilling the sewer excavation, was delivered by trucks to the jobsite and just dumped in a pile where it was needed; after which the trucks merely left the jobsite. The deliveries of the remaining 40% of the gravel sold, items 39 and 39'AV, used by JDP in constructing the subbase of the road, had a much more sophisticated method of delivery. The truck, with chains hooked onto the tailgate to prevent its opening more than about eight inches, would drive onto the roadway being constructed by JDP. The driver would then raise the body of the truck and slowly proceed forward spilling out the load, simultaneously spreading it onto the right of way. After item 39 had been “ dumped ”, JDP employees would then spread the gravel evenly over the roadbed with a bulldozer, water it to aid compaction, pass over it a minimum of eight times with a roller and finally would further adjust the course of the road to achieve the specified grade and compaction. Next Franjoine would deliver item 39AV and dispose of it in the same manner as described above. JDP would then go through the same operation as it had performed with item 39. Finally, after steel forms had been set, the gravel subbase was brought to a very fine tolerance with a specially equipped fine grading machine and then the surface was ready to be paved with concrete.
Although Franjoine played no part in the construction of the road, it was paid on the basis of the engineer’s measure in place. That is, once the gravel had been graded, moistened and compacted the project engineer would measure its thickness and compute the cubic measure of the' material laid and Franjoine would be paid accordingly.
Primarily on the basis of the above, the trial court concluded: “Here, Franjoine was Johnson’s subcontractor. The contracts between them contemplated work on the site which Johnson was directed to perform under the prime contract. *270 Franjóme’s work away from the site was actually done in performance of the prime contract to be paid as part of the unit contract price after Items 2 EF-B, 2 U F, 39 and 119A were either prepared, furnished, loaded, delivered, placed or spread on the roadbed, as required by the plans and specifications. Franjoine was to be paid after the engineer measured the Items in place.”
The Appellate Division unanimously affirmed that determination. It is our opinion that the findings of fact as determined by the courts below do not establish Franjoine’s status as a subcontractor as contemplated by the Lien Law.
Section 2 (subd. 10) of the Lien Law defines a subcontractor as “ a person who enters into a contract with a contractor and/ or with a subcontractor for the improvement of such real property or such public improvement or with a person who has contracted with or through such contractor for the performance of his contract or any part thereof.”
Section 2 (subd. 12) of the Lien Law defines a material-man as “ any person who furnishes material or the use of machinery, tools, or equipment, or compressed gases for welding or cutting, or fuel or lubricants for the operation of machinery or motor vehicles, either to an owner, contractor or subcontractor for, or in the prosecution of such improvement.”
The respondent and cross-claiming defendants argue that any person who merely furnishes materials to a contractor which become part of the permanent improvement is a subcontractor as such term is contemplated by the Lien Law. They arrived at this conclusion by first setting forth the definition of improvement. Section 2 (subd. 4) (as amd. by L. 1947, ch. 878) provides: “The term ‘improvement,’ when used in this chapter, includes the demolition, erection, alteration or repair of any structure * * * and any work done upon such property or materials furnished for its permanent improvement * * *, and shall also include the reasonable rental value for the period of actual use of machinery ” (emphasis added).
Respondent and cross-claiming defendants contend that if a subcontractor is any “ person who enters into a contract with a contractor * * * for the improvement of such real property or such public improvement” (emphasis added) and *271 improvement as defined includes materials furnished which become part of the permanent improvement, then it necessarily follows that Franjoine is a subcontractor because it supplied gravel which became part of the permanent improvement.
While the argument on its face seems logically compelling, we cannot accept it.
A materialman is defined as “ any person who furnishes material * * * to [a] contractor * * * for * * * such improvement ’ ’. It is true that a person can be a material-man and a subcontractor if he performs the duties of both. However, to accept the position outlined above would mean that a person can be a subcontractor, as defined, by merely performing the duties of a materialman, as defined. Surely, something more than the mere furnishing of materials which happen to become part of the permanent improvement must have been contemplated by the Legislature in order to achieve subcontractor status.
While there is a dearth of case law in our State on the question of what constitutes a materialman or subcontractor, the courts in recent years have been relying upon the statement in Dorn v. Johnson Corp. (16 A D 2d 1009) as a gauge on the question. In Dorn the court stated: “ Obviously, the mere existence of a contract, written or oral, express or implied, does not constitute a supplier a subcontractor and thus obliterate all distinction between subcontractor and materialman. Generally, a subcontractor is regarded as one who assumes performance of some part of the contract, so that labor or other service, and not merely the furnishing of materials, is involved. (See Lamson Co. v. Central N. Y. Regional Market Auth., 258 App. Div. 851, affd. 283 N. Y. 703; Herrmann & Grace v. City of New York, 130 App. Div. 531, 536, affd. on opinion below 199 N. Y. 600; Buhler Co. v. New York Dock Co., 170 App. Div. 486; Hedden Constr. Co. v. Proctor & Gamble Co., 62 Misc. 129, mod. 134 App. Div. 244; and cf. MacEvoy Co. v. United States, 322 U. S. 102, 108-109.) (16 A D 2d, at p. 1010.)
In applying this general standard to the facts as found by the courts below, we have concluded that Franjoine did not perform such duties under its contract so as to achieve subcontractor status.
*272 In reaching its determination, the trial court placed great weight on the following: (1) the work Franjoine did away from the jobsite; (2) the work done at the jobsite; and (3) the proscribed manner of payment.
As to the work performed away from the jobsite, there is nothing to indicate that Franjoine did anything other than load and deliver the materials ordered. If the trial court was referring to the fact that Franjoine was a subcontractor because he was obligated to supply materials meeting the State’s standard specifications, this would automatically transform most materialmen into subcontractors because materials ordered for a job usually must meet the specifications of that job. In short, there was no evidence of any work performed away from the jobsite that would not be performed by most materialmen in furtherance of their contractural obligations.
As to the work on the jobsite, the trial court was obviously referring to the deliveries of items 39 and 39AV. The argument is made that Franjoine was a subcontractor because, by dumping the gravel on the roadbed while the truck was moving, Franjoine was putting the material in place which was in effect performing labor on the job which JDP had contracted for. We cannot agree. There was testimony at the trial that this method of delivery was by far the most common method employed in making deliveries on road jobs. Moreover, there was no evidence that the method of delivery was in any way connected with the agreed upon compensation. Under such circumstances, we do not believe that the distinction between materialmen and subcontractors should be based upon such tenuous grounds.
As stated earlier, Franjoine was paid on the basis of engineer’s measure in place. This, however, is not relevant on the question of status. This is merely the manner by which materialmen delivering fill and other materials are usually paid. In any event, the fact that material was measured in this fashion can in no way convert the delivery of material into services rendered as a subcontractor so as to justify a finding of subcontractor status.
Accordingly, the order of the Appellate Division should be reversed and the complaint and cross claims dismissed.